**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X

In re:                                                          :
                                                                :
MPM Silicones, LLC, <u>et al.</u>,                              :     Case No. 14 Misc. 303
                                                                :
                    Debtors.                                    :     Chapter 11 Case No. 14-22503 (RDD)
_____                             :
                                                                :     Adversary Proceedings
BOKF, NA, solely as Trustee for the MPM                         :     No. 14-08227 (RDD)
Escrow LLC and MPM Finance Escrow Corp.                         :     No. 14-08228 (RDD)
8.875% First Priority Senior Secured Notes due                  :
2020; WILMINGTON TRUST, N.A., solely as                         :
Trustee for the Momentive Performance Materials                 :
Inc. 10% Senior Secured Notes due 2020,                         :
                                                                :
                    Movants,                                    :
                                                                :
                      v.                                        :
                                                                :
MOMENTIVE PERFORMANCE MATERIALS                                 :
INC., MOMENTIVE PERFORMANCE                                     :
MATERIALS WORLDWIDE INC.,                                       :
MOMENTIVE PERFORMANCE MATERIALS                                 :
USA INC., JUNIPER BOND HOLDINGS I LLC,                          :
JUNIPER BOND HOLDINGS II LLC, JUNIPER                           :
BOND HOLDINGS III LLC, JUNIPER BOND                             :
HOLDINGS IV LLC, MOMENTIVE                                      :
PERFORMANCE MATERIALS QUARTZ, INC.,                             :
MPM SILICONES, LLC, MOMENTIVE                                   :
PERFORMANCE MATERIALS SOUTH                                     :
AMERICA INC., MOMENTIVE                                         :
PERFORMANCE MATERIALS CHINA SPV                                 :
INC.,                                                           :
                    Respondents.                                :
_____             X

**REPLY OF BOKF, NA, IN ITS CAPACITY AS FIRST LIEN**
**TRUSTEE, AND WILMINGTON TRUST, NATIONAL**
**ASSOCIATION IN ITS CAPACITY AS 1.5 LIEN TRUSTEE IN**
**SUPPORT OF ORDER TO SHOW CAUSE REGARDING A STAY**
**<u>OR OTHER RELIEF PENDING APPEAL</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

ARGUMENT .................................................................................................................... 1

      I.     THE TRUSTEES ARE ENTITLED TO THE REQUESTED
           RELIEF PENDING APPEAL ...................................................................................... 1

           A.     The Noteholders May Suffer Irreparable Harm
                 If No Relief Is Granted .............................................................................. 1

           B.     No Party Will Suffer Substantial Injury If The Requested Relief Is
                 Granted ...................................................................................................... 3

           C.     The Trustees Are Likely To Succeed On Appeal ....................................... 6

                 1.     *Cram-Down Issue* .......................................................................... 6

                 2.     *Make-Whole Issue* ........................................................................ 9

           D.     Granting Relief Pending Appeal Is In The Public Interest ....................... 10

      II.    NO BOND SHOULD BE REQUIRED ....................................................................... 10

CONCLUSION ............................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Behrmann v. National Heritage Foundation*, 663 F.3d 704 (4th Cir. 2011) ................................5

*Consolidated Rock Prods. Co. v. DuBois*, 312 U.S. 510 (1941) ....................................................8

*CWCapital Asset Mgmt., LLC v. Burcam Capital II, LLC*, Nos. 5:13-CV-278-F, 5:13-CV-279-F,
    2013 WL 3288092 (E.D.N.C. June 28, 2013) ..........................................................................2

*In re A & F Enters., Inc. II*, 742 F.3d 763 (7th Cir. 2014) .............................................................1

*In re Adelphia Commc'ns Corp.*, 361 B.R. 337 (S.D.N.Y. 2007) ...........................................2, 10

*In re American HomePatient, Inc.*, 420 F.3d 559 (6th Cir. 2005) ..................................................7

*In re Calpine Corp.*, No. 05-60200 (BRL),
    2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ................................................................9

*In re DJK Residential, LLC*, No. 08-10375 (JMP), M-47 (GEL),
    2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) .............................................................................2

*In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) .............................................5

*In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935) .................................................................8

*In re Quade*, 496 B.R. 520 (Bankr. N.D. Ill. 2013) ................................................................6, 10

*In re Sch. Specialty*, No. 13-10125 (KJC),
    2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013) .................................................................9

*In re St. Johnsbury Trucking Co.*, 185 B.R. 687 (S.D.N.Y. 1995) ................................................2

*In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324 (5th Cir. 2013) ...........................7

*In re United Merchants & Mfrs.*, 138 B.R. 426 (D. Del. 1992) ...............................................6, 10

*In re Westwood Plaza Apartments, Ltd.*, 150 B.R. 163 (Bankr. N.D. Tex. 1993) ........................6

*SEC v. Daspin*, 557 F. App'x 46 (2d Cir. 2014) ...........................................................................1

*Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) .............................................1

*Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) .........................................................................6, 7

*Weber v. U.S. Trustee*, 484 F.3d 154 (2d Cir. 2007) ...................................................................10

**STATUTES**

11 U.S.C. § 1124(2) ...........................................................................................9

11 U.S.C. § 1129 ...........................................................................................10

11 U.S.C. § 1129(b)(2)(A)(iii) .........................................................................8

**OTHER AUTHORITIES**

Accounting Standards Codifications 450-20 (loss contingency) ....................................5

The Trustees are entitled to relief pending appeal.  Nothing in Plan Proponents' submission demonstrates otherwise.  *First*, the Noteholders may suffer irreparable injury absent such relief.  Although the Trustees do not concede that substantial consummation of the Plan will moot their appeal, Plan Proponents conspicuously do not disclaim an intent to argue equitable mootness.  The cases agree that mootness of an appeal, like this one, raising substantial claims of error—potentially foreclosing recovery of hundreds of millions of dollars—is irreparable injury.  *Second*, the Trustees are likely to succeed on appeal.  The bankruptcy court's decision on the cram-down issue is not only wrong; it is unprecedented.  And its decision on the make-whole issue is equally misguided.  *Third*, no party will suffer any harm from the limited relief sought that could outweigh the potential harm from denying such relief.  *Fourth*, preserving appellate review of these significant issues is in the public interest.  Finally, no bond is necessary here.

This Court need not defer to the bankruptcy court's resolution of these issues.  While the court's findings of fact on a motion for stay are reviewed for clear error, its legal rulings are reviewed de novo.  *SEC v. Daspin*, 557 F. App'x 46, 48 (2d Cir. 2014); *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014).  Indeed, the bankruptcy court itself stated that this Court "should have a right to look at these factors with fresh eyes."  Hr'g Tr. 181-182, Sept. 9, 2014.

## ARGUMENT

## I.   THE TRUSTEES ARE ENTITLED TO THE REQUESTED RELIEF PENDING APPEAL

### A.   The Noteholders May Suffer Irreparable Harm If No Relief Is Granted

If the Noteholders' appeal is dismissed as equitably moot, they will forever lose the ability to recover from the Debtors hundreds of millions of dollars to which they have, at a minimum, a serious claim.  That is "quintessential" irreparable injury, as the cases recognize (and common sense suggests).  *Cf., e.g.*, *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("economic injury is a quintessential injury upon which to base standing").

Notably, the Plan Proponents do not disavow an intent to argue equitable mootness on appeal.  Rather, they contend (at 20) that "equitable mootness is insufficient as a matter of law to demonstrate irreparable harm."  That is wrong.  While the cases may be divided as to whether a risk of equitable mootness *by itself* is sufficient to show irreparable harm, *see In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007), they consistently hold that where, as here, a finding of equitable mootness would result in the loss of the ability to redress a meaningful harm resulting from the bankruptcy court's order, it would work irreparable injury.  *See In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 689-90 & n.1 (S.D.N.Y. 1995) (even if "the threat of mootness … is not alone sufficient to establish a threat of irreparable injury," the threatened permanent loss of the substantive rights that could be vindicated on appeal *is* irreparable injury)[1]; *Adelphia*, 361 B.R. at 351-52 (risk of equitable mootness that would deprive bondholders of remedy for loss of hundreds of millions of dollars, where there is "a *significant* claim of error," is irreparable injury); *CWCapital Asset Mgmt., LLC v. Burcam Capital II, LLC*, 2013 WL 3288092, at *7 (E.D.N.C. June 28, 2013) (even if "loss of appellate rights, standing alone, is not sufficient to show irreparable harm," such harm exists where the "appellate issue … involves a significant legal question that will substantially affect [appellants'] rights").[2]  The Trustees have thus shown irreparable harm.

---

[1]  Plan Proponents' contention (at 21-22) that *St. Johnsbury*'s rationale applies only to the potential loss of the government's ability to enforce a statute is incorrect.  The permanent loss of the ability to vindicate economic rights is no less an injury, and no less irreparable, than a potential loss by the government.

[2]  *In re DJK Residential, LLC*, 2008 WL 650389 (S.D.N.Y. Mar. 7, 2008), on which the Plan Proponents principally rely, is not to the contrary.  That case involved an appeal from orders relating to debtor-in-possession financing, and the court found no irreparable harm in large part because the appellant would have the ability to raise its legal claims again at plan confirmation and thus had not shown concrete monetary injury from the challenged orders.  *Id.* at *4.  In that context, the court concluded that the mere procedural loss of an appeal, "standing alone," was not irreparable injury.  *Id.  DJK Residential* is in no way inconsistent with the proposition that, where—as here—equitable mootness would foreclose the ability to redress a substantial economic harm, it is irreparable injury.

2

**B.      No Party Will Suffer Substantial Injury If The Requested Relief Is Granted**

The Plan Proponents spend many pages arguing that a stay of the Plan's effective date will impose substantial harm on the Debtors and other parties.  But they have virtually nothing to say on that point regarding the Trustee's request for limited relief.  That is because *the limited relief would allow the Plan to go effective*.  It would *not* stay the Plan, but would merely require the Debtors to hold in escrow notes—not cash—in the amount of the make-whole and issue the Replacement Notes with a clause adjusting the interest rate if the Trustees prevail on appeal (or else stay only the replacement of the First Lien Notes pending appeal and escrow interest above the Replacement Note rate).  Thus, *none* of the harm that the Plan Proponents contend would arise from a stay of Plan effectiveness will occur if the Court grants the limited relief.  And the "contingent liability" of which the Plan Proponents complain already exists under the terms of the Plan whether or not the limited relief is granted.

*Risk to the $600 million Rights Offering*.  The Plan Proponents assert that the Backstop Commitment Agreement will automatically terminate on October 10, 2014 if the closing date has not occurred.  But the Backstop Agreement does *not* terminate if "the Effective Date [of the Plan] occurs" before October 10, 2014 and the Rights Offerings have been consummated.  *See* Backstop Agreement § 9.2(f).  Because the limited relief would allow the Plan to go effective before October 10, no risk of termination will arise.  Similarly, the Plan Proponents assert that the Backstop Agreement will terminate if the Confirmation Order is stayed, *see id.* § 9.2(g), but that too will not happen if the Court grants the limited relief.

Indeed, even if the Court were to grant the broader relief of a stay of the effective date of the Plan, the Backstop Agreement would not be at genuine risk.  The Agreement provides that any termination of the agreement can be waived by Apollo and the Ad Hoc Committee of

3

Second Lien Noteholders—i.e., the Plan Proponents that oppose this motion. *Id.* §§ 1.1, 9.2(f), 9.2(g), 10.7. Similarly, the Plan provides that the condition precedent to the Plan's Effective Date that the Backstop Agreement not be terminated likewise can be waived by the Debtors, with the consent of Apollo and the Ad Hoc Committee. Plan §§ 1.154, 11.1(b), 11.2. In other words, the Plan Proponents have the power to prevent any supposed harm from termination of the Backstop Agreement, since they can waive any such termination or condition precedent.[3]

Similarly, the Plan Proponents assert that the subscribers in the Rights Offering may request the return of their funds if the closing has not occurred by October 1, 2014. But the subscription agreements provide that "the 'Closing'[] will take place … on the Effective Date." Dkt. No. 508-1, Ex. D-1 §§ 1(c)-(d), 8(a). Thus, the limited relief poses no risk to the Rights Offering because it would allow the Plan to go effective—and the Rights Offering to close— before October 1. In any event, the subscription agreements obligate the subscribers to subscribe if the Rights Offering closes before December 31, 2014. *Id.* §§ 1(a), 4(b), 6(a), 6(c), 7.[4]

*Incremental Costs During the Pendency of a Stay*. The limited relief would not impose any of the incremental interest costs, professional fees, or operational costs of a prolonged bankruptcy. The Debtors would promptly emerge from bankruptcy with a de-leveraged balance sheet—shedding more than $2 billion in junior debt and obtaining $600 million in new equity, *see* Plan §§ 5.6, 5.8, 5.9; Disclosure Statement at 11-16, 28—and would pay interest at the Replacement Note rate (subject to adjustment on appeal).

The *only* harm the Plan Proponents contend will occur if the Court grants the limited relief is that Debtors will have a "contingent liability" for the make-whole and cram-down

---

[3] Notably, the Plan is also conditioned on the Confirmation Order being a Final Order, Plan § 11.1(d), a condition that the Plan Proponents will have to waive in any event in order to close by October 10.

[4] As of September 9, 2014, $589.5 million of the $600 million in subscriptions had been received. Tr. (9/9/14) at 94.

interest rate amounts.  Opp. 29-30.  *But that contingent liability already exists and was voluntarily assumed in the Plan.*  The Plan requires the Debtors to issue Replacement Notes with a "present value" equal to outstanding principal, accrued interest, and "any applicable make-whole premium to the extent Allowed" by a "Final Order," and thus requires the Debtors to pay such amounts if an appellate court so orders.  Plan §§ 1.18, 1.30, 5.4(b)(ii), 5.5(b)(ii).  Issuing contingent notes and placing them in escrow would not increase any "harm" from that existing contingent liability.  Whether or not such notes are issued, the Trustees' appeal will require the Debtors to recognize and/or disclose a loss contingency under Accounting Standards Codifications 450-20 (loss contingency), depending on whether the risk of loss is probable or reasonably possible, *see* ASC 450-20-55-13.  This requirement would not be affected by whether contingent notes have been escrowed.  *See* ASC 450-20-55-22 to 55-37 (illustrative cases on application of accrual and disclosure standards to matters in litigation).

In short, the limited relief the Trustees seek would not impose any harm on the Debtors or other parties.  It is a simple and sensible measure that the Debtors can readily take, consistent with what their Plan already provides and what they have testified is feasible, and which does not require them to incur any out-of-pocket costs or cash expenditures.  It also ensures that any third parties dealing with the Debtors in the future—the parties that the equitable mootness doctrine is designed to protect, *see In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005)—will have notice of the Debtors' contingent liabilities under the Plan.  And it ensures that the important unresolved issues presented by this appeal will be decided by an appellate court. In these circumstances, courts have granted partial stays or other limited relief tailored to protect the appellant's rights while allowing the debtor's plan to go effective.  *See, e.g.*, *Behrmann v. National Heritage Foundation*, 663 F.3d 704, 708, 713-14 (4th Cir. 2011) (limited stay of plan's

5

release provisions permitting rest of the plan to go effective); *In re United Merchants & Mfrs.*, 138 B.R. 426, 428 (D. Del. 1992) (partial stay of plan distributions to one class of creditors); *In re Westwood Plaza Apartments, Ltd.*, 150 B.R. 163, 169 (Bankr. N.D. Tex. 1993) (limited relief requiring escrow of certain plan distributions while allowing plan distributions to other creditors); *In re Quade*, 496 B.R. 520, 531(Bankr. N.D. Ill. 2013) (conditional stay of order awarding funds to debtor and requiring funds to stay in account pending further order).

Nor would granting the limited relief requested improperly "flip the standard" (Opp. 29). The limited relief in no way requires the Debtors to bond the Trustees' appeal. The Debtors would not escrow or pay any cash or collateral; they would simply escrow notes that would be distributed if the contingency expressly contemplated in the Plan—the requirement to pay the make-whole and a market rate of interest—occurs. Rule 8005 permits the court to fashion any appropriate relief pending appeal to protect the rights of the parties. Like a stay of the effectiveness of the plan as a whole, the limited relief protects Appellants from the risk of irreparable injury if their appeal is deemed equitably moot. But it is plainly less intrusive than a stay of the effectiveness of the plan as a whole. It is accordingly proper under Rule 8005.

### C.    The Trustees Are Likely To Succeed On Appeal

1. *Cram-Down Issue*. The bankruptcy court recognized that Debtors had *actually obtained*, on the best terms available in the market, replacement financing to cash out the Noteholders—with an interest rate well above that imposed on the Noteholders. Bench Ruling, Dkt. No. 979, at 82. But the court refused to consider that unrebutted evidence of the rate an efficient market would generate, holding that, under the plurality opinion in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), the market rate was irrelevant as a matter of law. Bench Ruling at 72. That ruling is unprecedented: Plan Proponents have cited no other case, and the Trustees are

aware of none, recognizing the existence of an efficient market rate for comparable financing yet deliberately imposing a lower rate on secured creditors crammed down under a chapter 11 plan.

To the contrary, as the bankruptcy court itself acknowledged (*id.* at 80)—but the Plan Proponents conspicuously fail to mention—the majority view is that *Till*'s formula approach, developed in the chapter 13 context, is *not* controlling in chapter 11.  Both courts of appeals to address the issue have so held.  *See In re American HomePatient, Inc.*, 420 F.3d 559, 568 (6th Cir. 2005); *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 331 (5th Cir. 2013). And most lower courts have followed the approach in *American HomePatient*:  In chapter 11, a court should first determine the efficient market rate, and resort to the formula approach only if the market rate cannot be determined.  Mem. ISO Stay ("Mem.") 14.  While courts have often held, on the facts of particular cases, that no efficient market rate could be determined and thus turned to the formula approach, *see Texas Grand*, 710 F.3d at 333, they have looked first to the existence of an efficient market for comparable financing—which plainly existed in this case.

That approach was sanctioned by the *Till* plurality itself.  The plurality chose the formula approach in the context of subprime loans to chapter 13 individual consumer debtors, in which it concluded that there was no efficient market, and that "subprime lenders would," if permitted, "exploit borrowers' ignorance and charge rates above what a competitive market would allow." *Till*, 541 U.S. at 481-82.  But the plurality expressly noted that there *is* a market for debtor financing in chapter 11, and that "when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce."  *Id.* at 476 n.14.  The bankruptcy court's and the Plan Proponents' contention that *Till*'s formula approach is "binding" and must be applied in chapter 11 is thus refuted by *Till* itself.  And the Plan Proponents' efforts to brush aside *Till*'s distinction between chapter 11 and chapter 13 are wholly unpersuasive.

They argue (at 36) that "footnote 14 is not discussing general financing in the marketplace because it was 'describing loans that lenders *want* to make to the debtor itself.'"  But that is precisely the point:  Where, as here, there is an efficient market for comparable loans to the debtor, the market rate is the appropriate starting place for determining the present value of the secured lender's claim—as other courts have repeatedly held.

Indeed, the bankruptcy court's contrary analysis misconstrues the fundamental purpose of chapter 11's cramdown provisions, which are intended to provide the secured creditor with the *full value* of its claim, even if that claim is paid off over time.  As Judge Learned Hand explained in the seminal decision of *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935), "payment ten years hence is not generally the equivalent of payment now.  Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property.  … [T]he [cramdown provisions were not] intended to deprive him of that …, unless by a substitute of the most indubitable equivalence."  *Id.* at 942; *see also Consolidated Rock Prods. Co. v. DuBois*, 312 U.S. 510, 528 (1941) (holding unlawful treatment of secured bondholders that received only "an inferior grade of securities," because "[f]ull compensatory provision must be made for the entire bundle of rights which the creditors surrender").  These principles have been incorporated into the current cram-down provisions, whose "present value" requirement is intended to ensure that "payment ten years hence" *is*, as far as possible, "the equivalent of payment now."  Otherwise, the creditor has not received the required full value.  Here, the Noteholders unquestionably did not receive full value.  Not only did the exit financing obtained in the market bear a higher interest rate, but after the confirmation ruling the Notes have traded well below their face amount.  *See* Mem. 2 n.4.

8

2. *Make-Whole Issue*.  The Plan Proponents mischaracterize (at 5) the Trustees'

argument on this point.  The Trustees do not argue that the Debtors' bankruptcy filing (and

resulting acceleration) triggered their obligation to pay the make-whole premium.  Had the

Debtors reinstated the Notes under the Plan pursuant to the Bankruptcy Code—which allows the

Debtors to "reinstate the maturity" and original payment terms of the Notes "notwithstanding

any contractual provision … to … receive accelerated payment," 11 U.S.C. § 1124(2)—the

make-whole would not have come due.  Instead, the Debtors chose—over the objections of the

Noteholders—to redeem the Notes and refinance the debt under the Plan.  Because the Debtors

opted to redeem the Notes before the date (October 15, 2015) specified in the Notes' make-

whole provision, the Debtors owe the make-whole premium.  Numerous cases construing

indentures with substantially identical language—which the Plan Proponents do not address—

have so recognized.  (Mem. at 17-18; Mot. Trustees Certification of Direct Appeal at 11-12.)

Plan Proponents also mischaracterize (at 11) the bankruptcy court's ruling on the

Trustees' damages claim for breach of the Indentures or the common-law rule of perfect tender.

The bankruptcy court held that "New York law would, in fact, provide for such a claim," but that

the claim would be disallowed as "unmatured interest" under § 502(b)(2).  Bench Ruling, Dkt.

No. 979, at 46:4-:22; *see id.* at 45-49.  Plan Proponents avoid acknowledging this because the

"majority of courts" have held that such damages are not disallowable as "unmatured interest."

*In re Sch. Specialty*, 2013 WL 1838513, *5 (Bankr. D. Del. Apr. 22, 2013); Mem. 19-20.

\*          \*          \*

To obtain relief pending appeal, a party must show only a "substantial possibility of

success."  *In re Calpine Corp.*, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008).

Because there is no support—in *Till* or elsewhere—for the bankruptcy court's decision to ignore

unrebutted evidence of the rate an efficient market would produce, and because the court's make-whole decision broke with other courts and disregarded the indentures' plain language, the Trustees have surpassed that standard.

### D.   Granting Relief Pending Appeal Is In The Public Interest

The Plan Proponents argue that the public interest favors a quick reorganization.  But that is true only if the plan is lawful; there is no public interest in confirming an unlawful plan.  11 U.S.C. § 1129 (permitting confirmation only if statutory "requirements are met"); *Adelphia*, 361 B.R. at 367-68 (while "there is … a strong public interest in … efficient resolution of bankruptcy proceedings," "there is [also] a significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review").  In any event, the limited relief the Trustees seek allows Debtors to reorganize.  And this appeal presents important legal questions affecting many chapter 11 cases and lending decisions.  Their resolution is in the public interest.  *Weber v. U.S. Trustee*, 484 F.3d 154, 158-59 (2d Cir. 2007) (noting importance of appellate review to "foster the development of coherent bankruptcy-law precedent").

## II.   NO BOND SHOULD BE REQUIRED.

As the Plan Proponents acknowledge (Opp. 39), a bond is posted to protect the non-moving parties from the potential harm of a stay or other relief pending appeal.  Because the limited relief will not impose any harm on the Plan Proponents, no bond is required.  *See Quade*, 496 B.R. at 530 n.1, 532 (granting limited relief without requiring a bond); *United Merchants*, 138 B.R. at 430 ("[A] bond is unnecessary … because … [debtor] will not suffer any loss as a result of the stay pending appeal.").

## CONCLUSION

The Trustees' request for a stay or limited relief pending appeal should be granted.

10

Dated:  New York, New York
   September 18, 2014

                **WILMER CUTLER PICKERING
                HALE AND DORR LLP**

             By: /s/ Philip D. Anker_____

**ROPES & GRAY LLP**          Philip D. Anker (No. PA7833)
Mark R. Somerstein           William J. Perlstein
Mark I. Bane             7 World Trade Center
Michael S. Winograd          250 Greenwich Street
1211 Avenue of the Americas      New York, New York 10007
New York, NY 10036-8704       Telephone:  (212) 230-8800
Telephone:  (212) 596-9000      Facsimile: (212) 230-8888
Facsimile:  (212) 596-9090

Stephen Moeller-Sally (*pro hac vice*)    Danielle Spinelli
Amanda Phillips           1875 Pennsylvania Avenue NW
Prudential Tower           Washington, DC 20006
800 Boylston Street          Telephone: (202) 663-6000
Boston, MA 02199-3600       Facsimile: (202) 663-6363
Telephone:  (617) 951-7000
Facsimile:  (617) 951-7050       **DECHERT LLP**
                Michael J. Sage (MS-6998)
*Attorneys for Wilmington Trust, National*  Brian E. Greer (BG-1011)
*Association, as Trustee*        1095 Avenue of the Americas
                New York, New York 10036-6797
                Telephone: (212) 698-3500
                Facsimile:  (212) 698-3599

                G. Eric Brunstad, Jr.
                90 State House Square
                Hartford, Connecticut 06103-3702
                Telephone: (860) 524-3999
                Facsimile:  (860) 524-3930

                *Attorneys for BOKF, NA, as First Lien
                Trustee*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that I have served the foregoing Reply in Support of Order to Show Cause Regarding a Stay or Other Relief Pending Appeal with the Clerk of the Court by using the Court's CM/ECF system on September 18, 2014.  I certify that I have served the foregoing Reply in Support of Order to Show Cause Regarding a Stay or Other Relief Pending Appeal on counsel of record via first-class mail at the following addresses:

Roger Netzer
Matthew A. Feldman
James C. Dugan
Stephen C. Mouritsen
**Willkie Farr and Gallagher, LLP**
787 Seventh Avenue
New York, NY 10019

Philip C. Dublin
Ira S. Dizengoff
Abid Qureshi
Deborah J. Newman
**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, NY 10036

Dennis F. Dunne
Michael L. Hirschfeld
Samuel A. Khalil
**Milbank, Tweed, Hadley & McCloy LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Seth H. Lieberman
Patrick Sibley
**Pryor Cashman LLP**
7 Times Square
New York, NY 10036

By:  /s/    Philip D. Anker_____
Philip D. Anker (No. PA7833)